UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 07-4075(DSD/SRN)

Mesfin Tewolde,

        Plaintiff,

v.                                         **ORDER**

Owens & Minor Distribution, Inc.,

        Defendant.


      P. Chinedu Nwaneri, Esq. and Nwaneri & Associates PLLC,
4655 Nicols Road, Suite 106, Eagan, MN 55122, counsel for
plaintiff.

      Daniel R. Wachtler, Esq., Michael J. Moberg, Esq.,
Ellen A. Brinkman, Esq. and Briggs & Morgan, 80 South
Eighth Street, Suite 2200, Minneapolis, MN 55402, counsel
for defendant.


      This matter is before the court upon defendant's motion for
summary judgment. Based upon a review of the file, record and
proceedings herein, and for the reasons stated, the court grants in
part defendant's motion.


## BACKGROUND

      This national origin discrimination and reprisal action arises
out of plaintiff Mesfin Tewolde's ("Tewolde") employment with
defendant Owens & Minor Distribution, Inc. ("Owens & Minor").
Owens & Minor distributes medical supplies to hospitals and other
related entities. Tewolde is a native of Eritrea who worked the
night shift as a material handler at Owens & Minor's distribution

center in Mounds View, Minnesota from October 13, 2003, until his termination on May 2, 2005.

## I.    Mounds View Distribution Center

Managerial positions at the Mounds View distribution center include, in order of authority, the general manager, warehouse manager and shift supervisors.  Material handlers are nonmanagement positions responsible for receiving and stocking products, picking products for customer orders, preparing the orders for shipment and occasionally cleaning the warehouse.  The lead material handler for each shift supervises and coordinates the other material handlers' activities.   This includes making assignments, checking the accuracy of orders, training coworkers, ensuring that work procedures meet production schedules, promoting efficiency, solving problems, motivating coworkers, recommending or initiating personnel actions, maintaining security of the warehouse and performing material handler functions at proper productivity and error levels.

Owens & Minor tracks its inventory using a Client Server Warehouse system ("CSW system") that automatically increases inventory count as products are stocked and depletes the count as orders are filled.  After products are stocked in the warehouse, certain material handlers are responsible for filling customer orders by using a forklift to pick the products off of the shelves ("pickers").  The shift supervisor assigns customer orders to the

pickers, and each order generally includes specific quantities of several different products called "lines."

When a picker arrives at work, he logs onto a handheld radio frequency computer ("RF unit") that contains a small screen, keypad and barcode scanner. The RF unit displays the first line of the picker's order. The picker drives the forklift to the appropriate location in the warehouse, scans the product, picks the ordered quantity, places it on a pallet and hits the enter key on the RF unit. The next line then appears and the process is repeated. Once a pallet is full, the picker takes it to the shipping area. If a line is too big for one pallet, the picker can load up the quantity that will fit, type in that number on the RF unit and press the "M key." The M key splits the line, allowing the picker to take the full pallet to the shipping area and return for the remainder of the line. This causes an additional line to be registered in the CSW system. For example, if a line consisted of ten cases of plastic gloves but only five cases fit on a pallet, the picker would place those five cases on the pallet, enter five on the RF unit, press the M key and deliver the pallet to shipping. The RF unit would then indicate that five cases remained to be picked. Upon returning for those cases, the picker would again enter five on the RF unit, press the enter key and take the pallet to the shipping area. Thus, the one line of plastic gloves would register as two lines.

It is also possible to use the M key to count product. For example, one line might consist of 500 combs that the picker must count, place in bags and put on a pallet. If a bag holds only fifty combs, the picker could keep track of the count by pressing the M key after filling each bag. After filling the first bag and pressing the M key, the RF unit would identify 450 combs remaining to be picked, after the next fifty it would display 400 combs, and so on. This would cause the one line of 500 combs to register as ten lines of fifty combs in the CSW system.

Management at the Mounds View distribution center tracked a picker's productivity by lines picked per hour until late 2003 or early 2004. At that time, management began tracking productivity by lines picked per eight-hour shift, with the expectation that pickers would pick 320 lines per shift and make no more than one error for every 1,000 lines picked.

## II. Collective Bargaining Agreement

During Tewolde's employment, a collective bargaining agreement ("CBA") between Owens & Minor and Minnesota's Health Care Union Local 113 SEIU ("Union") governed Owens & Minor's relationship with warehouse employees "in the job classifications of Material Handler, Receiving Clerk and Truck Driver-Heavy." (See Nwaneri Decl. Ex. 1A art. 1(A).) During an initial ninety-day probationary period, an employee did not pay Union dues and could be terminated by Owens & Minor with or without cause. (Id. Ex. 1A art. 1(F),

(L).)  Thereafter, an employee covered by the CBA could be terminated only with "just cause," which included "dishonesty" and falsification of "any report, records or applications."  (Id. Ex. 1A art. 6(A); Ex. 3.)

The CBA also mandated the following process for filling job vacancies, including lead positions:

> Vacancies, new positions, or temporary vacancies lasting five (5) days or more shall be awarded to the senior qualified employee applicant, provided that such employee currently possesses the necessary skills to perform the work.  Qualifications for the job shall be posted by the Employer.  No employee shall be eligible to bid on a job vacancy or new position until the employee has worked in the employee's existing job for a minimum of one hundred twenty (120) days.  The provisions of the preceding sentence shall not apply when an employee bids on a vacancy or new position in the employee's same job classification.

(Id. Ex. 1A art. 2(D), 12(B).)  Seniority was "determined by length of service based on [the] date that an employee is permanently hired into the bargaining unit."  (Id. Ex. 1A art. 2(A).)

Finally, the CBA provided that there "shall be no discrimination by the Union or [Owens & Minor] against any employee because of membership or non-membership in the Union or because of the assertion of rights afforded by this Agreement."  (Id. Ex. 1A art. 1(C).)

## III.  Tewolde's Employment and Termination

Shortly after being hired as a picker, Tewolde was trained by the lead material handler on the night shift, Charles Evenson

("Evenson"), to use the M key for splitting pallets and counting. (Evenson Dep. at 7-8, 13-14.) Evenson testified that at that time employees were not limited in their M key transactions. (Id. 46-47.) In November and December 2003, Rick Flannigan ("Rick"), a material handler on the morning shift, worked with Tewolde and others on the night shift to reduce picking errors and increase productivity. (Rick Flannigan Dep. at 12-13.) To accomplish this, Rick trained everyone on the night shift to use the M key to count. (Id. at 14-15.)

On January 9, 2004, the warehouse manager Steve Julkowski ("Julkowski") met with Tewolde and three other material handlers on the night shift about problems with their error rate. (Moberg Aff. Ex. 9 ¶ 5; Tewolde Dep. at 76.) Nevertheless, shortly before the end of Tewolde's ninety-day probationary period, Owens & Minor's general manager Marc Johnson ("Johnson") commented to Rick Flannigan that he really liked Tewolde and was going to hire him. (Rick Flannigan Dep. at 16.) Julkowski thereafter told Tewolde that he had been hired for a permanent position pursuant to Johnson's instructions although Julkowski disliked him. (Tewolde Dep. at 104.)

In mid-January 2004, Julkowski posted a signup sheet for a lead material handler position on the night shift. By January 22, there were no names on the sheet. Tewolde called Rick Flannigan about the posting, and Rick advised him that it was proper to sign

up so long as there was no senior employee on the list. Tewolde immediately signed up. (Id. at 82; Rick Flannigan Dep. at 26-27.) Julkowski removed the signup sheet the following day. (Rick Flannigan Dep. at 27.) That same day, Aaron Flannigan, a material handler on the night shift who was also the Union steward, asked Julkowski when Tewolde would begin as lead. (Aaron Flannigan Dep. at 7.) Julkowski indicated that Tewolde's name had been scratched off the list and that Craig Brown ("Brown"), a less senior material handler, had signed up. (Id.) Julkowski also mentioned that there had been issues with Tewolde's counting. (Id. at 7-8.) The following week, Julkowski approached more senior material handlers, Marco Brito ("Brito") and Chad Brunette, about applying for the position, indicating that he needed somebody that spoke better English than Tewolde. (Brito Dep. at 11-12, 19; Brunette Dep. at 8.) Julkowski told Tewolde on February 6, 2004, that somebody had removed the lead position posting without his knowledge. (Tewolde Dep. at 82-86.)

Tewolde filed a complaint with Owens & Minor's human resources department on February 16, 2004, alleging that Julkowski was discriminating against him based on his culture, ethnicity and English-speaking capabilities. (Nwaneri Decl. Ex. 2.) That evening, Julkowski, who normally works from 6:30 a.m. to 4:00 p.m., returned to the warehouse at 10:00 p.m. and followed Tewolde around the warehouse floor while he was picking. (Tewolde Dep. at 94-95;

Aaron Flannigan Dep. at 12-13, 35.) The next day, Julkowski formally disciplined Tewolde for the first time by filing a corrective action form against him for picking errors. (Tewolde Dep. at 99-100, 256-57; Julkowski Dep. at 123.)

On February 18, 2004, Johnson informed Tewolde by letter that he had not been selected for the lead position because the CBA required him to be employed for 120 days and because he did not "currently possess the necessary skills to perform the job." (Nwaneri Decl. Ex. 4.) The letter further noted that Tewolde's allegation of discrimination had been investigated and was without merit. (Id.) That same day, Johnson told Rick Flannigan that Tewolde had "turned out to be not a very good employee." (Rick Flannigan Dep. at 20, 90.) Julkowski interviewed Brown but the lead position remained open because Brown did not meet the 120-day requirement.

Julkowski posted the lead position again in May 2004 to correspond with Brown's 120th day on the job. Tewolde and Brown signed the posting, which did not list the qualifications for the position.[1] (Nwaneri Decl. Ex. 5.) After interviewing both candidates, Julkowski determined that Tewolde was not qualified for the position and hired Brown. (Julkowski Dep. at 85, 96; Tewolde Dep. at 115-17.) Tewolde filed a grievance with the Union on May

---

[1] Two other employees signed the posting but were not considered because they did not meet the 120-day requirement. Brito also signed up but later withdrew from consideration.

28, 2004. (Nwaneri Decl. Ex. 6.) On October 22, 2004, Tewolde filed a charge of discrimination with the Minnesota Department of Human Rights ("MDHR"), alleging that he was denied the lead position because of his national origin and was issued the February 16, 2004, corrective action for filing the complaint with human resources in violation of the Minnesota Human Rights Act ("MHRA"). (Id. Ex. 7.)

In November 2004, Brown told Brett Quinn ("Quinn"), the night shift supervisor, that Tewolde had been misusing the M key. At a November 19, 2004, meeting with Johnson, Julkowski, Quinn and Aaron Flannigan, Tewolde was asked who trained him to use the M key and why he used it. (Tewolde Dep. at 144-48.) On January 12, 2005, Julkowski and Quinn met with Tewolde to discuss his productivity, which was below Owens & Minor's lines-per-shift requirement. (Id. at 150-52; Moberg Aff. Ex. 9 ¶ 18.) In mid-March 2005, Quinn reminded Tewolde on separate occasions to secure his forklift safety harness and to sign the daily checklist for the forklift. (Tewolde Dep. at 158-60.) Julkowski issued Tewolde a corrective action on March 23, 2005, because of safety concerns related to the forklift harness and checklist, complaints "from numerous teammates," Tewolde's 219 lines-per-shift average and his failure to follow orders. (Nwaneri Decl. Ex. 15.) Tewolde refused to sign the corrective action. (Tewolde Dep. at 166-67.) Tewolde received

another corrective action on April 8, 2005,[2] because of safety concerns related to the forklift checklist and his average of 227 lines per shift. (Nwaneri Decl. Ex. 15.) Tewolde again refused to sign the form. (Tewolde Dep. at 176.)

Tewolde's productivity increased to approximately 300 lines per shift the following week. On April 20, 2005, however, Quinn told Julkowski that Tewolde was using the M key to inflate his productivity numbers. Julkowski checked Owens & Minor's records and confirmed that Tewolde used the M key an average of 40.2 times per day the week of April 11 and 75.8 times per day the following week. (Moberg Aff. Ex. 9 ¶ 21.) Before the April 8 corrective action, Tewolde averaged ten M key transactions per shift. At an April 25, 2005, meeting with Johnson and Julkowski, Tewolde indicated that he used the M key "based on the order" and "to prevent errors." (Tewolde Dep. at 185, 190.) Johnson and Julkowski then suspended Tewolde pending further investigation, and terminated him on May 2, 2005. (Id. at 191; Nwaneri Decl. Ex. 11A, 12.) Tewolde grieved his termination to the Union the following day. (Nwaneri Decl. Exs. 12, 13.)

On May 10, 2005, the arbitrator denied Tewolde's May 2004, grievance. (Moberg Aff. Ex. 10 ¶ 12 at 13.) The arbitrator determined that Tewolde was not minimally qualified for the lead

---

[2] The corrective action was dated March 30, 2005, and signed by Julkowski on April 8, 2005.

position because his error rate in December 2003 and January, April and May 2004 was respectively 5.14, 4.99, 1.76 and 1.05 per one thousand lines picked, and he averaged only 217 and 237 lines per shift in April and May 2004. (<u>Id.</u> Ex. 10 ¶ 12 at 10-12.) The arbitrator, however, ordered reposting of the lead position because the May 2004 posting did not state the qualifications as required by the CBA. (<u>Id.</u> Ex. 10 ¶ 12 at 13.)

Tewolde filed another charge of discrimination with the MDHR, on October 4, 2005, alleging that Owens & Minor retaliated against him for filing the October 2004 charge of discrimination by increasing his cleaning duties, issuing the corrective action on March 23, 2005, suspending him and terminating him. (Nwaneri Decl. Ex. 14.) In response to the October 2004 charge of discrimination, the MDHR found probable cause on January 4, 2006, that Owens & Minor discriminated against Tewolde based on his national origin by not promoting him to the lead position in January and May 2004, and that Owens & Minor retaliated against him following his discrimination complaint to human resources by "making him work on more burdensome orders than other employees and hampering [his] ability to meet [Owens & Minor's] productivity requirement by taking adverse measures against him." (<u>Id.</u> Ex. 11 ¶ 4.) Two days later, the MDHR found probable cause based on the October 2005

charge of discrimination that Owens & Minor committed reprisal discrimination in violation of the MHRA by terminating Tewolde. (<u>Id.</u> Ex. 17.)

On January 11, 2006, an arbitrator received evidence and heard testimony related to Tewolde's May 2005 grievance from Johnson, Julkowski, Scott Hintz - Tewolde's supervisor until February 2004 - Rick Flannigan, Aaron Flannigan and Tewolde. On April 21, 2006, the arbitrator denied the grievance, stating that

> [t]he record shows that [Tewolde], shortly after being issued a written warning about his low production on April 8, 2005, increased his use of the M key from an average of 10 uses per shift to as many as 75 in the following weeks. The record shows that [Tewolde] was informed in 2003 and on several occasions thereafter that misuse of the M key would have the effect of overstating his production and could lead to disciplinary action, including discharge.

> The nexus between the written warning of April 8, 2005 and [Tewolde's] dramatic increase in use of the M key in the weeks following is hard to dismiss. [Tewolde's] response that he was doing it because of errors is not creditable.

(Moberg Aff. Ex. 10 ¶ 24 at 33.) Accordingly, the arbitrator found that Tewolde deliberately misused the M key to inflate his production numbers, and that Owens & Minor appropriately terminated him for dishonesty pursuant to the CBA. (<u>Id.</u> Ex. 10 ¶ 24 at 33-34.) Moreover, in response to allegations of discrimination based on Union affiliation in violation of article 1(C) of the CBA, the

arbitrator found that the "evidence in the record shows that [Tewolde] was assigned to cleaning and related duties on the same basis as ... other workers." (Id. Ex. 10 ¶ 24 at 35.)

Letters dated June 12, 2007, from the MDHR noted that Tewolde withdrew his charges of discrimination in order to pursue "redress through private civil action." (Id. Exs. 1, 2.) The Equal Employment Opportunity Commission ("EEOC") issued Tewolde a notice of right to sue on June 25, 2007,[3] and Tewolde filed this action on September 25, 2007. (Nwaneri Decl. Ex. 22.) The amended complaint asserts national origin discrimination and reprisal claims against Owens & Minor pursuant to the MHRA and Title VII of the Civil Rights Act of 1964 ("Title VII"). Owens & Minor moved for summary judgment on December 1, 2008.[4]

---

[3] The EEOC's notice refers to a specific charge but the record contains no details about the date or contents of that charge. Nevertheless, Owens & Minor does not distinguish between the EEOC charge and the MDHR charges, and the court treats them as coextensive. Cf. Veeder v. Cargill, Inc., Civ. No. 02-1711, 2003 U.S. Dist. LEXIS 23245, at *12 (D. Minn. Dec. 23, 2003) ("Based on a work-sharing agreement, the EEOC cross-filed with the [MDHR].").

[4] Instead of filing a response memorandum, Tewolde's counsel submitted a declaration by Tewolde on January 26, 2009. Owens & Minor replied on February 6, 2009. On February 11, 2009, Tewolde's counsel filed an opposition memorandum. The court denied Owens & Minor's request to strike Tewolde's opposition memorandum at oral argument but permitted Owens & Minor to file a letter response. The court's denial of Owens & Minor's request to strike in no way condones the flagrant violation of the Federal Rules of Civil Procedure and this district's Local Rules by Tewolde's counsel. Future dilatoriness will not be tolerated.

13

**DISCUSSION**

**I.  Summary Judgment Standard**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material only when its resolution affects the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party.  See id. at 252.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. See id. at 255.  The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial.  See Celotex, 477 U.S. at 324.  Moreover, if a plaintiff cannot support each essential element of his claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial.  Id. at 322-23.

## II.  Minnesota Human Rights Act Claims

Owens & Minor argues that Tewolde's MHRA claims are untimely. The MHRA requires a plaintiff to file suit within ninety days of giving notice to the MDHR of his intent to bring a civil action. Minn. Stat. § 363A.33, subdiv. 1(3).  Here, Tewolde provided notice to the MDHR on or before June 12, 2007, but did not bring this action within the required ninety days.   Therefore, the court grants Owens & Minor's motion to dismiss Tewolde's MHRA claims.

## III.  Title VII Claims

Tewolde alleges that Owens & Minor discriminated against him based on his national origin in violation of Title VII by refusing to make him a lead material handler in January and May 2004. Further, Tewolde asserts that Julkowski issued the February 2004 corrective action in reprisal for Tewolde's complaint to human resources.  Tewolde also maintains that his assignments to clean and pick bulk orders, the March 2005 and April 2005 corrective actions and his subsequent suspension and termination were reprisal for his October 2004 charge of discrimination.

### A.    Scope of Charge

Owens & Minor contends that some of Tewolde's claims exceed the scope of his discrimination charges.  A Title VII plaintiff must first exhaust administrative remedies by filing a charge with the EEOC and receiving notice of a right to sue.  Stuart v. Gen. Motors Corp., 217 F.3d 621, 630 (8th Cir. 2000) (quotation

omitted). "The information contained in an EEOC charge must be sufficient to give the employer notice of the subject matter of the charge and identify generally the basis for a claim, but it need not specifically articulate the precise claim or set forth all the evidence an employee may choose to later present in court." Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1123 (8th Cir. 2006) (citation omitted). Rather, a court construes an administrative charge liberally, permitting a plaintiff to "seek relief for any discrimination that grows out of or is like or reasonably related to the substance of the allegations in the administrative charge." Stuart, 217 F.3d at 631. Therefore, a later-filed civil suit may encompass allegations "as broad as the scope of any investigation that reasonably could have been expected to result from the initial charge of discrimination." Id.

Owens & Minor contends that Tewolde's national origin discrimination claim related to the May 2004 lead posting exceeds the scope of the October 2004 charge of discrimination. Although that charge did not specifically mention the reposting of the lead position in May 2004, it expressly stated that a "white employee with less seniority" was eventually given the position. An investigation into this allegation reasonably could have been expected to include the January and May 2004 lead position postings. Therefore, Tewolde's national origin discrimination claim based on the May 2004 posting is reasonably related to the

allegations in the October 2004 charge, and the court determines that he adequately exhausted his administrative remedies.[5]

## B. Effect of Arbitrations

In support of his Title VII claims, Tewolde argues that he was qualified for the lead position and that he was not terminated for just cause. Owens & Minor maintains that the arbitrators' decisions preclude Tewolde from advancing such arguments.

It is well established that general arbitration provisions in a CBA "do not preclude a civil remedy for a violation of Title VII." Patterson v. Tenet Healthcare, Inc., 113 F.3d 832, 837 (8th Cir. 1997) (citing Alexander v. Gardner-Denver Co., 415 U.S. 36, 39 (1974)); see also Bell v. Conopco, Inc., 186 F.3d 1099, 1101 (8th Cir. 1999); Varner v. Nat'l Super Mkts., 94 F.3d 1209, 1213 (8th Cir. 1996). Whether earlier arbitration of contractual issues in a CBA precludes later relitigation of those issues in a Title VII action in federal court, however, is an open question in the Eighth

_____

[5] Owens & Minor also asserts that Tewolde failed to exhaust a claim for national origin discrimination based on his 2005 discipline and termination. The complaint alleges that Owens & Minor's "purported reasons for termination of Tewolde's employment were a mere pretext for discrimination and reprisal in retaliation for Tewolde's complaints of discrimination." (Compl. ¶ 37.) This allegation, however, is made in support of Tewolde's reprisal claim. Therefore, the court determines that the complaint does not assert a national origin discrimination claim against Owens & Minor based on its 2005 conduct. Moreover, even if Tewolde asserted such a claim, the claim would fail because the October 2005 charge of discrimination alleged only reprisal. See Wallin v. Minn. Dep't of Corr., 153 F.3d 681, 688 (8th Cir. 1998) ("[I]t is well established that retaliation claims are not reasonably related to underlying discrimination claims.").

Circuit.  The resolution of this issue begins with an analysis of
<u>Gardner-Denver</u>.

The employee in <u>Gardner-Denver</u> grieved his termination
pursuant to a broad arbitration clause in a CBA, arguing that he
was wrongfully terminated and had been the victim of racial
discrimination.  415 U.S. at 38-43.  The arbitrator denied the
grievance without reference to the employee's race discrimination
allegation.  <u>Id.</u> at 42.  The Court determined that "the federal
policy favoring arbitration does not establish that an arbitrator's
resolution of a contractual claim is dispositive of a statutory
claim under Title VII."  <u>Id.</u> at 47 n.6.  Specifically, the Court
stated that the doctrines of election of remedies and waiver were
inapplicable because

> [i]n submitting his grievance to arbitration,
> an employee seeks to vindicate his contractual
> right under a [CBA].  By contrast, in filing a
> lawsuit under Title VII, an employee asserts
> independent statutory rights accorded by
> Congress.  The distinctly separate nature of
> these contractual and statutory rights is not
> vitiated merely because both were violated as
> a result of the same factual occurrence.  And
> certainly no inconsistency results from
> permitting both rights to be enforced in their
> respectively appropriate forums.

<u>Id.</u> at 49-50.  In addition, the Court indicated that the "policy
reasons for rejecting the doctrine of election of remedies and
waiver in the context of Title VII are equally applicable to the

doctrines of *res judicata* and collateral estoppel."[6]  <u>Gardner-Denver</u>, 415 U.S. at 49 n.10.[7]  Finally, the Court noted that deferral to arbitral decisions would thwart Congress's intent to have federal courts exercise final enforcement responsibility over Title VII's provisions and could leave an employee with inadequate procedural protections.  <u>Gardner-Denver</u>, 415 U.S. at 56-58.  The Court specified that arbitral proceedings are not commensurate with judicial proceedings because the arbitrator derives its authority solely from the CBA and is limited to interpreting and applying that document.  <u>Id.</u> at 56.  Moreover, "the factfinding process in arbitration usually is not equivalent to judicial factfinding."  <u>Id.</u> at 57.  In conclusion, the Court instructed that a "federal court should consider the employee's [Title VII] claim *de novo*," according the arbitral decision "such weight as the court deems appropriate" depending on the specific facts and circumstances of each case.  <u>Id.</u> at 60, 60 n.21.

---

[6] Res judicata refers to "the effect of a judgment on the merits in barring a subsequent suit between the same parties or their privies that is based on the same claim."  <u>McDonald v. City of W. Branch</u>, 466 U.S. 284, 287 n.5 (1984).  Under the doctrine of collateral estoppel, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case."  <u>Id.</u> (quotation omitted).

[7] <u>Gardner-Denver</u>'s reasoning was later applied to expressly reject the application of the doctrines of res judicata and collateral estoppel to an arbitration award in a 42 U.S.C. § 1983 action.  <u>McDonald</u>, 466 U.S. at 292.

Relying on Gardner-Denver, a split panel of the Sixth Circuit Court of Appeals held that "if a plaintiff does not expressly waive [his] right to bring claims in federal court, a prior arbitration does not preclude [a court] from reconsidering all factual issues underlying a statutory claim." Nance v. Goodyear Tire & Rubber Co., 527 F.3d 539, 549 (6th Cir. 2008); see also Dillaway v. Ferrante, Civ. No. 02-715, 2003 U.S. Dist. LEXIS 23468, at *16 (D. Minn. Dec. 9, 2003) (relying on Gardner-Denver for proposition that "in the typical case, there is no collateral estoppel effect of employee-adverse arbitration decisions"). In so holding, the court stated that the interpretation and enforcement of antidiscrimination statutes is beyond the expertise of "the ordinary arbitrator whose primary expertise concerns 'the demands and norms of industrial relations.'" Nance, 527 F.3d at 549 (quoting Gardner-Denver, 415 U.S. at 57)). The court also found significant the arbitration process's limited factfinding procedures because "where suits are tried is often as important as the substantive rights sought to be vindicated." Id. In short, the Nance majority interpreted Gardner-Denver and its progeny as ensuring "that the federal courts' ability to decide federal civil-rights claims - even those that grow out of the same facts as the claims submitted to labor arbitration proceedings - are not controlled or handicapped by what happens in the arbitral forum." Id. at 552.

A recent Supreme Court decision upholding the enforceability of a provision of a CBA that "clearly and unmistakably require[d] union members to arbitrate claims arising under the Age Discrimination in Employment Act of 1967 ("ADEA")," however, displaced <u>Nance</u>'s reliance on <u>Gardner-Denver</u>. <u>See</u> <u>14 Penn Plaza LLC v. Pyett</u>, 129 S. Ct. 1456, 1461 (2009). In <u>14 Penn Plaza</u>, the court noted that <u>Gardner-Denver</u> and its progeny

> "did not involve the issue of the enforceability of an agreement to arbitrate statutory claims." Those decisions instead "involved the quite different issue [of] whether arbitration of contract-based claims precluded subsequent judicial resolution of statutory claims. Since the employees there had not agreed to arbitrate their statutory claims, and the labor arbitrators were not authorized to resolve such claims, the arbitration in those cases understandably was held not to preclude subsequent statutory actions."

<u>Id.</u> at 1468 (quoting <u>Gilmer v. Interstate/Johnson Lane Corp.</u>, 500 U.S. 20, 35 (1991)). Significantly, the Court expressly rejected the "broad dicta [in those opinions] that was highly critical of the use of arbitration for the vindication of statutory antidiscrimination rights." <u>Id.</u> at 1469. First, the Court distinguished the existence of a substantive right to be free from discrimination from the right to a particular forum for enforcing that right. <u>Id.</u> ("The decision to resolve ADEA claims by way of arbitration instead of litigation does not waive the statutory right to be free from workplace age discrimination; it waives only

the right to seek relief from a court in the first instance."). Second, the Court dismissed any suggestion that an arbitral forum provides inadequate procedural safeguards for enforcement of the ADEA. Id. at 1471. Finally, the Court found no significance in a "'union's exclusive control over the manner and extent to which an individual grievance is presented.'" Id. at 1472 (quoting Gardner-Denver, 415 U.S. at 58 n.19).

In effect, 14 Penn Plaza subjects an arbitrator's decision interpreting and applying a CBA that expressly incorporates federal antidiscrimination law to highly deferential review on appeal. See id. at 1471 n.10 (arbitrator's decision subject to limited judicial review under 9 U.S.C. § 10(a)). As a result, 14 Penn Plaza directly contradicts the Nance majority's interpretation of Gardner-Denver and its progeny by sanctioning limited federal court review of earlier arbitrated federal antidiscrimination claims. If an arbitrator's actions can directly limit judicial review of federal antidiscrimination laws, deference to an arbitrator's interpretation and application of a CBA in a later-filed federal court action is warranted even if that deference precludes an employee's statutory claims. See Nance, 527 F.3d at 561 (Batchelder, J., concurring). Therefore, a court affords an arbitrator's decision interpreting and applying the terms of a CBA "an extraordinary level of deference" in a later Title VII action in federal court and confirms the decision "so long as the

22

arbitrator is even arguably construing or applying the contract and acting within the scope of his authority." Crawford Group, Inc. v. Holekamp, 543 F.3d 971, 976 (8th Cir. 2008) (quotations omitted); see also Nance, 527 F.3d at 559-61 (Batchelder, J., concurring).

In this case, the arbitrators acted within the scope of their authority and arguably construed and applied the CBA. Accordingly, the court affords substantial deference to their conclusions.

**C.  Merits**

The McDonnell Douglas burden-shifting framework applies to claims of discrimination and reprisal brought pursuant to Title VII. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-06 (1973); see Recio v. Creighton Univ., 521 F.3d 934, 938-39 (8th Cir. 2008) (reprisal); Cardenas v. AT&T Corp., 245 F.3d 994, 998 (8th Cir. 2001) (national origin discrimination). Under that framework, a plaintiff must first establish a prima facie case of discrimination. Cardenas, 245 F.3d at 998. The defendant then must articulate a legitimate nondiscriminatory reason for its actions. Id. If the defendant advances such a reason, the plaintiff must produce evidence demonstrating that the defendant's reason is pretext for unlawful discrimination. Id.

**1.  National Origin Discrimination**

To establish a prima facie case of national origin discrimination based on a failure to promote, an employee must show that he: "(1) is a member of a protected class; (2) applied for the

23

promotion; (3) was qualified for the promotion; and (4) lost the promotion to persons who were not members of the protected class." Id. at 998 (citation omitted).  Here, Tewolde was a member of a protected class, applied for a promotion and lost the promotion to an individual outside of the protected class.  The arbitrator, however, found that Tewolde was not minimally qualified for the lead position in January 2004 because he had not been in his position for 120 days and did not meet Owens & Minor's expected error rate and production level.  Moreover, the arbitrator concluded that, despite improvements in error rate and production level, Tewolde was not minimally qualified for the lead position in May 2004 because his performance remained below Owens & Minor's established expectations.  Therefore, deferring to the arbitrator's findings, the court determines that Tewolde cannot establish a prima facie case of national origin discrimination because he was not qualified for the lead position promotion.  Accordingly, summary judgment on this claim is warranted.

### 2. Reprisal

Employer's may not retaliate "against employees who initiate or participate in a proceeding or investigation that claims the[] employer violated Title VII."  Recio, 521 F.3d at 938 (citing 42 U.S.C. § 2000e-3(a)).  An employee establishes a prima facie case of retaliation by showing that: "(1) the employee engaged in protected conduct; (2) reasonable employees would have found the

challenged retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct." Id. at 938-39 (quotation omitted). A causal link must be established by evidence that "retaliatory motive played a part in the adverse employment action." Kipp v. Mo. Highway & Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002) (quotation omitted). "An inference of a causal connection between a charge of discrimination and [adverse employment action] can be drawn from the timing of the two events, but in general more than a temporal connection is required to present a genuine factual issue on retaliation." Peterson v. Scott County, 406 F.3d 515, 524 (8th Cir. 2005).

### a.    Human Resources Complaint

Owens & Minor first argues that there is no causal link between Tewolde's February 16, 2004, complaint to human resources and the corrective action issued the following day by Julkowski because Julkowski did not know about Tewolde's complaint before issuing the corrective action. (See Julkowski Dep. at 87, 123.) The temporal proximity between Tewolde's complaint and Julkowski's alleged return to the warehouse and disciplinary action against Tewolde, however, permits an inference that Julkowski retaliated against Tewolde because of the human resources complaint. See Van Horn v. Best Buy Stores, L.P., 526 F.3d 1144, 1149 (8th Cir. 2008) (temporal proximity between protected activity and adverse action can "in rare circumstances" support causal inference); Rath v.

<u>Selection Research, Inc.</u>, 978 F.2d 1087, 1090 (8th Cir. 1992)
(same).  Moreover, the fact that the corrective action was the
first formal disciplinary action taken against Tewolde supports an
inference that it was issued in retaliation for his protected
conduct.  Therefore, Tewolde has established a prima facie case of
reprisal.  Moreover, Owens & Minor does not offer a legitimate
nondiscriminatory reason for Julkowski's conduct.[8]  (<u>See</u> Def. Br.
at 40-41.)  Accordingly, the court determines that summary judgment
is not warranted on this claim.

### b.    October 2004 Charge of Discrimination

Tewolde also maintains that in response to his October 2004
charge of discrimination, he was assigned more difficult orders,
required to clean more than other pickers, disciplined, suspended
and terminated.  Specifically, Tewolde argues that his assignments
to pick bulk orders and clean prohibited him from meeting Owens &
Minor's performance expectations, which led to the March and April
2005 corrective actions and ultimately resulted in his termination.
The court, however, defers to the arbitrator's finding that Tewolde

---

[8] Even if Owens & Minor argued that Julkowski issued the
corrective action because Tewolde's "error rate was not subsiding
at an acceptable pace," (Moberg Aff. Ex. 10 ¶ 12 at 11), the same
facts establishing a prima facie case would also establish a fact
issue as to pretext.  <u>See</u> <u>Wallace</u>, 442 F.3d at 1120-21 ("In effect,
a plaintiff may concede that the proffered reason, if truly the
motivating cause for the termination *would have been* a sufficient
basis for the adverse action while arguing that the employer's
proffered reason was not the true reason for the action." (emphasis
in original)).

was not treated differently from other workers with respect to "cleaning and related duties." (Moberg Aff. Ex. 10 ¶ 12 at 35.) Without evidence that Tewolde was treated differently immediately following his protected conduct, he can rely only on the temporal proximity between the October 2004 charge and the March, April and May 2005 adverse employment actions to establish causation. Such temporal proximity, however, does not permit a causal inference. See <u>Van Horn</u>, 526 F.3d at 1149 (two-month interval does not support inference of causation). Accordingly, Tewolde has not shown a prima facie case of retaliation, and summary judgment is warranted on this claim.

## CONCLUSION

Based on the above, **IT IS HEREBY ORDERED** that Owens & Minor's motion for summary judgment [Doc. No. 20] is granted in part and denied in part.

Dated: June 10, 2009

s/David S. Doty
David S. Doty, Judge
United States District Court